No. 25-3978

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

————————————

MARY BLEICK; TODD BUTLER; ALLEN SKIERSKI; GARY PETRIME,
*Plaintiffs-Appellants*,

v.

SHERYL MAXFIELD, SUPERINTENDENT AKIL HARDY; ROBERT SPRAGUE; JOY BLEDSOE,
*Defendants-Appellees*.

————————————

Appeal from the United States District Court for the
Southern District of Ohio
Case No. 2:25-cv-01140

————————————

## BRIEF OF APPELLEES

————————————

ANECA E. LASLEY
*LEAD COUNSEL*
ICE MILLER LLP
250 WEST STREET, SUITE 700
COLUMBUS, OHIO 43215
(614) 462-1085
ANECA.LASLEY@ICEMILLER.COM

JOSHUA A. KLARFELD
ICE MILLER LLP
600 SUPERIOR AVENUE EAST,
SUITE 1600
CLEVELAND, OH 44114
(216) 394-5063
JOSHUA.KLARFELD@ICEMILLER.COM

*Counsel for Appellees*

December 22, 2025

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1, Appellees hereby make this "negative report," because they have been named solely in their official capacities on behalf of agencies of the State of Ohio, and, therefore, are exempt from corporate disclosure requirements.

/s/ Aneca E. Lasley
Aneca E. Lasley

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES ................................................................ v

STATEMENT ON ORAL ARGUMENT ................................................ x

STATEMENT OF JURISDICTION ......................................................... 1

STATEMENT OF THE ISSUES ............................................................. 1

STATEMENT OF THE CASE ................................................................. 2

    A.   Ohio's Unclaimed Funds Law ................................................. 2

    B.   Ohio's Unclaimed Funds Law Is Amended ............................ 4

    C.   Appellants Challenge Portions of H.B. 96 ............................ 6

SUMMARY OF THE ARGUMENT ........................................................ 8

ARGUMENT ......................................................................................... 11

    I.    STANDARD OF REVIEW. ..................................................... 11

    II.   THE DISTRICT COURT DID NOT ERR IN
        FINDING THAT INJUNCTIVE RELIEF IS NOT
        AVAILABLE TO APPELLANTS ON THEIR
        TAKINGS CLAIM ................................................................... 11

        A.   *Knick* and Its Progeny Foreclose Appellants'
            Request for Injunctive Relief ....................................... 12

        B.   Appellants' Cited Authority Is Inapposite ................... 15

    III.  THE DISTRICT COURT DID NOT ABUSE ITS
         DISCRETION IN DENYING APPELLANTS'
         REQUEST FOR INJUNCTIVE RELIEF ............................. 19

        A.   Appellants Do Not Have a Strong Likelihood of
            Success on the Merits ................................................... 20

1.  The Amended Statutes do not result in a taking ................................................. 22

    (a)  Challenged statutes are presumed constitutional ............................................. 22

    (b)  H.B. 96 amends Chapter 169 to create "true escheat" statutes ................... 23

    (c)  True escheat statutes are constitutional ............................................. 24

    (d)  The amended statutes are consistent with others that have long been upheld ........................................................ 27

2.  Appellees are unlikely to prevail on their Due Process claims ............................................. 28

B.  Appellants Will Not Suffer Any Irreparable Harm When the Legislation Goes Into Effect on January 1, 2026 ............................................................ 31

C.  The "Substantial Harm to Others" and "Public Interest" Factors Do Not Support Injunctive Relief ........................................................................ 38

1.  The issuance of an injunction would, indeed, cause substantial harm to others ........... 39

2.  The issuance of an injunction is not in the public interest ...................................................... 40

IV.  THE DISTRICT COURT DID NOT ERR IN RECOGNIZING APPELLANTS DID NOT REQUEST INJUNCTIVE RELIEF BASED ON AN ALLEGED PRE-DEPRIVATION NOTICE VIOLATION UNDER THE DUE PROCESS CLAUSE ............................................. 44

CONCLUSION ................................................................ 47

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)........................ 48

CERTIFICATE OF SERVICE.................................................................... 49

ADDENDUM .......................................................................................... 50

# <u>TABLE OF AUTHORITIES</u>

<span style="font-variant: small-caps">Cases</span>                                                                                   <span style="font-variant: small-caps">Pages</span>

*Ammex, Inc. v. Wenk,*
    936 F.3d 355 (6th Cir. 2019) ........................................................ 39

*Barber v. Charter Twp. of Springfield, Michigan,*
    31 F.4th 382 (6th Cir. 2022) ................................................... 15, 17

*Bd. of Missions v. Adams,*
    462 U.S. 791 (1983) ....................................................................... 30

*Cedar Point Nursery v. Hassid,*
    594 U.S. 139 (2021) .............................................................. 15, 18, 19

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke
    Corp.*, 511 F.3d 535 (6th Cir. 2007) ............................................. 34

*Christianson v. King Cnty.,*
    239 U.S. 356 (1915) ....................................................................... 26

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ......................................................................... 32

*Connection Distrib. Co. v. Reno,*
    154 F.3d 281 (6th Cir. 1998) ........................................................ 39

*Crowell v. Benson,*
    285 U.S. 22 (1932) ......................................................................... 23

*Cruz-Gomez v. Lynch,*
    801 F.3d 695 (6th Cir. 2015) ........................................................ 30

*Delaware v. New York,*
    507 U.S. 490 (1993) ....................................................................... 26

*D.T. v. Sumner Cnty. Sch.,*
    942 F.3d 324 (6th Cir. 2019) ........................................................ 32

*Eubanks v. Wilkinson,*
    937 F.2d 1118 (6th Cir. 1991) ...................................................... 23

*Gonzales v. Nat'l Bd. of Medical Exam'rs*,
  225 F.3d 620 (6th Cir. 2000) .................................................... 21, 22

*Hurley v. Kincaid*,
  285 U.S. 95 (1932) ................................................................... 32, 33

*Int'l Union of Painters & Allied Trades District Council No. 6 v.*
  *Smith*, 148 F.4th 365, (6th Cir. 2025) ............................... 11, 31, 33

*Jones v. Flowers*,
  547 U.S. 220 (2006) ............................................................ 28, 29, 30

*Keene Grp., Inc. v. City of Cincinnati, Ohio*,
  998 F.3d 306 (6th Cir. 2021) .......................................................... 30

*Kelo v. City of New London, Connecticut*,
  545 U.S. 469 (2005) ....................................................................... 42

*Knellinger v. Young*,
  134 F.4th 1034 (10th Cir. 2025) ..................................................... 13

*Knick v. Township of Scott, Pennsylvania*,
  588 U.S. 180 (2019) ............................................................... *passim*

*Kuhnle Bros, Inc. v. Cnty. of Geauga*,
  103 F.3d 516 (6th Cir. 1997) .......................................................... 16

*Mennonite Bd. of Missions v. Adams*,
  462 U.S. 791 (1983) ....................................................................... 30

*Montgomery v. Carter County*,
  226 F.3d 758 (6th Cir. 2000) .......................................................... 42

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
  339 U.S. 306 (1950) ............................................................ 28, 29, 30

*Narrigan v. Goldberg*,
  772 F. Supp. 3d 182 (D. Mass. 2025) ............................................. 14

*Obama for America v. Husted*,
  697 F.3d 423 (6th Cir. 2012) .......................................................... 34

*Ohio v. Becerra,*
    87 F.4th 759 (6th Cir. 2023)..........................................................20

*Plain Loc. Sch. Dist. Bd. of Educ. v. DeWine,*
    486 F. Supp. 3d 1173 (S.D. Ohio 2020).........................................22

*Ross v. Meese,*
    818 F.2d 1132 (4th Cir. 1987) .......................................................33

*Sec. Sav. Bank v. State of California,*
    263 U.S. 282 (1923) .......................................................................26

*Sogg v. Zurz,*
    121 Ohio St.3d 449 (2009) ..........................................................4, 5

*Standard Oil Co. v. New Jersey,*
    341 U.S. 428 (1951) .............................................24, 25, 26, 27, 29

*State ex rel. Dix v. Celeste,*
    11 Ohio St.3d 141 (1984)...............................................................22

*Stormans, Inc. v. Selecky,*
    586 F.3d 1109 (9th Cir. 2009) .......................................................16

*Suever v. Connell,*
    439 F.3d 1142 (9th Cir. 2006) .......................................................34

*Taylor v. Westly,*
    402 F.3d 924 (9th Cir. 2005) .........................................................34

*Taylor v. Westly,*
    488 F.3d 1197 (9th Cir. 2007) .......................................................16

*Tennessee v. Dep't of Educ.,*
    104 F.4th 577 (6th Cir. 2024).........................................................39

*Texaco, Inc. v. Short,*
    454 U.S. 516 (1982) .............................................25, 26, 27, 28, 41

*Texas Mun. League Intergovernmental Risk Pool v. Texas*
    *Workers' Comp. Comm'n*, 74 S.W.3d 377 (Tex. 2002) ....................26

*United States v. Salerno*,
    481 U.S. 739 (1987) ............................................................ 23

*Williams v. Cuyahoga Cnty.*,
    776 F. Supp. 3d 653 (N.D. Ohio 2025) ............................... 23

*Wilson v. Williams*,
    961 F.3d 829 (6th Cir. 2020) .............................................. 20

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................ 16, 19

**STATUTES & RULES** ............................................................**PAGES**

6 Cir. R. 26.1 ........................................................................ i

6 Cir. R. 27(f) ...................................................................... 7

6 Cir. R. 28(a) .................................................................... 51

28 U.S.C. § 1331 ................................................................... 1

28 U.S.C. § 1292(a)(1) ........................................................ 1

42 U.S.C. § 1983 .......................................................... 1, 6, 7

Fed. R. App. P. 26.1 ............................................................. i

Fed. R. Evid. 201(b) .......................................................... 38

Ohio Rev. Code Chapter 169 ............................. 10, 23, 29, 40, 46

Ohio Rev. Code § 169.01 .................................................. 2, 6

Ohio Rev. Code § 169.02 ...................................................... 2

Ohio Rev. Code § 169.03 ...................................................... 3

Ohio Rev. Code § 169.05 ...................................................... 3

Ohio Rev. Code § 169.06 ...................................................... 4

Ohio Rev. Code § 169.08 ............................................. 5, 35, 36, 37

Ohio Rev. Code § 169.09 ............................................................ 5

Ohio Rev. Code § 123.281 ............................................. 5, 41, 42, 43

Ohio Rev. Code § 123.282 ............................................................ 5


**OTHER AUTHORITIES** ............................................................ **PAGES**

Bernert, *An Examination of Unclaimed Property Laws After the Adoption of RUUPA: Suggestions for Continued Advancement*, 71 Tax Law. 941 (2018) .............................. 24

House Bill 96 ...................................................................... *passim*

Karen Kasler, The Statehouse News Bureau, "Federal judge rules Ohio can transfer unclaimed funds to be used for Browns' stadium," Dec. 10, 2025, available at https://www.statenews.org/government-politics/2025-12-10/federal-judge-rules-ohio-can-transfer-unclaimed-funds-to-be-used-for-browns-stadium ........................................... 37

*Origins and Development of Modern Escheat*, 61 Colum. L. Rev. 1319, 1326-27 (1961) ................................................... 23, 24

## STATEMENT ON ORAL ARGUMENT

Appellees Sheryl Maxfield (in her official capacity as Director of Commerce), Akil Hardy (in his official capacity as Superintendent of the Division of Unclaimed Funds), Robert Sprague (in his official capacity as Treasurer of the State of Ohio), and Joy Bledsoe (in her official capacity as Executive Director of the Ohio Facilities Construction Commission) (collectively, the "Ohio Agency Appellees"), state oral argument is unnecessary in this appeal because the facts and legal arguments are adequately presented in the briefs and Record, and the decisional process would not be significantly aided by oral argument.

As the District Court explained, the law precluding Appellants' request for injunctive relief is well-settled and set forth in numerous binding decisions from the United States Supreme Court and the Sixth Circuit Court of Appeals. In considering Appellants' motion giving rise to this appeal, the District Court held a full-day hearing, which included witness testimony and oral argument. (*See* Transcript, R. 45, Page ID # 482.) When it considers the merits of this appeal, this Court will have all the trial court briefing, the 199-page trial court transcript, the District Court's well-reasoned opinion, and the appellate briefs at its disposal.

The Ohio Agency Appellees do not believe further oral argument will be necessary or warranted. If anything, oral argument will only delay this appeal's resolution.

## STATEMENT OF JURISDICTION

Appellants appeal the District Court's denial of their Motion for a Preliminary Injunction and Motion for a Temporary Restraining Order (the "Motion"). (Motion for Preliminary Injunction and TRO, R. 20, Page ID # 243.) The District Court had jurisdiction over Appellants' federal constitutional claims,[1] brought under 42 U.S.C. § 1983, pursuant to 28 U.S.C. § 1331. The District Court entered its order denying Appellants' Motion on December 9, 2025, (Opinion and Order, R. 44, Page ID ## 459, 481), and Appellants timely appealed on December 12, 2025, (Notice of Appeal, R. 46, Page ID # 681). This Court has jurisdiction to hear this appeal of the District Court's interlocutory order refusing to issue an injunction pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.    Whether the District Court correctly determined injunctive relief was not available to Appellants for an alleged taking where the challenged legislation provides adequate mechanisms for obtaining just

---

[1] Appellants also brought several state law claims over which the district court did not have jurisdiction, which are not part of this appeal.

compensation in the form of money damages, post-hoc administrative claims, and later judicial review.

2.    Whether the District Court acted within its discretion by finding Appellants did not demonstrate they were entitled to the "extraordinary remedy" of a preliminary injunction where, at a minimum, Appellants could not demonstrate (1) a strong likelihood of success on the merits of their takings claim, and (2) that they would suffer irreparable harm without the requested injunction.

## STATEMENT OF THE CASE

### A.    Ohio's Unclaimed Funds Law

Ohio's Unclaimed Funds Law—codified at Ohio Rev. Code §§ 169.01 *et seq.*—provides that certain dormant funds are to be reported as unclaimed funds and remitted for deposit and held in Ohio's Unclaimed Funds Trust Fund (the "UFTF"). (Stipulation of Facts, R. 42, Page ID # 453, ¶ 7.) Funds deposited into the UFTF include certain bank account funds, certificates of deposit, and insurance proceeds that have been dormant or for which there has been no owner-generated activity for a statutorily prescribed period of time. Ohio Rev. Code § 169.02.

The Ohio Department of Commerce, Division of Unclaimed Funds (the "Division") is charged with implementing Ohio's Unclaimed Funds Law and maintaining the UFTF. § 169.05. (Stipulation of Facts, R. 42, Page ID # 453, ¶ 8.) Potential holders of unclaimed funds, such as financial institutions, must annually review their records to identify and report qualifying dormant funds to the Division. § 169.03. (Stipulation of Facts, R. 42Page ID # 453, ¶ 9.)

Before any unclaimed funds are transferred from a holder to the UFTF, the unclaimed funds statutes require compliance with certain notice procedures. In particular, each holder is required to "send notice to each owner of each item of unclaimed funds having a value of fifty dollars or more at the last known address of the owner as shown by the records of the holder." § 169.03(E). (Stipulation of Facts, R. 42, Page ID # 453, ¶ 10.) The Division audits holders to confirm compliance with the Unclaimed Funds Law, including the requisite notice procedures. § 169.03(G). (Stipulation of Facts, R. 42, Page ID # 453, ¶ 11.)

Once the funds move from the holder to the UFTF, the Director of Commerce must provide a yearly publication notice to all owners of unclaimed funds in all 88 Ohio counties, including specific reference to

3

the names and last known addresses for unclaimed funds owners reportedly owed $50 or more. *See* § 169.06(A), (B). Additionally, the Director of Commerce must make a list of the owners of unclaimed funds over $10, with the same individual specificities, available during business hours. *See* § 169.06(C). The Director of Commerce also is authorized to "give any additional notice using any electronic or print medium that the director deems necessary to inform the owner of the whereabouts of the owner's funds," § 169.06(D), which the Director of Commerce does through the website the Division maintains at https://unclaimedfunds.ohio.gov/.

### B.   Ohio's Unclaimed Funds Law Is Amended.[2]

On June 30, 2025, Governor Mike DeWine signed House Bill 96 ("H.B. 96"), Ohio's biennial budget bill. (Stipulation of Facts, R. 42, Page

---

[2] Appellants cite to *Sogg v. Zurz*, 121 Ohio St.3d 449, 453 (2009), in their Statement of the Case, for the proposition that "[u]nder Ohio law, these [unclaimed] funds 'are not abandoned; they are the property of their owner.'" (Appellants' Corrected ("Corr.") Brief, App. R. 18, Page # 14.) Appellants also claim there is nothing in the Unclaimed Funds Act "to suggest the 'General Assembly intended to treat unclaimed funds as if they had been abandoned, forfeited, or escheated.'" (*Id.*) But *Sogg* did not hold the General Assembly could never amend the unclaimed funds statutes. With H.B. 96, the General Assembly expressly **did** amend the Unclaimed Funds Law to provide that such funds **are** deemed abandoned

ID # 454, ¶ 16.) H.B. 96 amended the Unclaimed Funds Law to provide, as relevant here, that funds held in the UFTF for ten years or more are deemed abandoned by operation of law and escheat to the State. The amended statutes provide as follows:

- Funds deposited before January 1, 2016 will escheat on January 1, 2026. Ohio Rev. Code § 169.08(I)(1).

- Funds deposited after January 1, 2016 will escheat after ten years—unless, of course, they are claimed at any time during that ten-year period. § 169.09(I)(2).

- Claimants still may recover escheated funds until January 1, 2036 by filing a valid claim. § 169.08(I)(3)(b).

- The escheated funds are to be transferred to the newly created Ohio Cultural and Sports Facility Performance Grant Fund. *See* §§ 123.282, 169.08(I)(4).

- Section 229.40 of H.B. 96 makes an appropriation for funds to be used for the construction of a new stadium:

  > There is hereby appropriated $1,000,000,000 in fiscal year 2026 to appropriation item 042428, Cultural, Sports, and Major Sports Facilities Performance Grants, from revenues received in the Ohio Cultural and Sports Facility Performance Grant Fund … The Office of Budget and Management shall use $600,000,000 from appropriation item … to support construction of a transformational major sports facility mixed-use project pursuant to section 123.281 of the Revised

---

and **will** escheat to the State. *Sogg* in no way controls this Court's determination of this case.

Code that is associated with a Brook Park economic development project.

- The Office of Budget Management is instructed to use the remaining $400,000,000 "to support construction or renovation of an Ohio cultural or sports facility." *Id.*

- All notice provisions remain in place. *See generally* Ohio Rev. Code §§ 169.01 *et seq*.

More than $4 billion is currently held in the UFTF. (Stipulation of Facts, R. 42, Page ID # 455, ¶ 19.) Approximately $1.7 to $1.9 billion of the funds currently in the UFTF are scheduled to escheat to the State on January 1, 2026. (*Id.*, Page ID # 455, ¶ 20.)

### C.    Appellants Challenge Portions of H.B. 96.

On October 2, 2025, Appellants filed the underlying lawsuit challenging the amendments to the Unclaimed Funds Law.[3] (*Id.*, Page ID # 452, ¶ 1.) Each Appellant has unclaimed funds associated with their name that are currently held in the UFTF. (*Id.*, Page ID # 455, ¶ 22.) Appellants' Complaint sets forth seven counts (the "Complaint"). (*See* Complaint, R. 1, Page ID ## 1-26.) Counts I and II are brought under 42

---

[3] Appellants filed a prior lawsuit in state court on July 7, 2025, asserting the same counts in the Franklin County Court of Common Pleas. *See Bleick, et al., v. Maxfield, et al.*, Case No. 25-cv-0057515. Appellants did not move for injunctive relief there. Appellants later voluntarily dismissed this state court action on October 1, 2025. *See id.*

U.S.C. § 1983, and claim that the amended statutes permitting unclaimed funds to be escheated violate the Takings Clause of the U.S. Constitution and the Due Process Clause of the Fourteenth Amendment. (*Id.*, Page ID ## 18-19.) Counts III through VII allege various Ohio state law claims and are not at issue here. (*Id.*, Page ID ## 19-21.)

On October 31, 2025, nearly four months after first filing suit in state court, Appellants filed a Motion for Temporary Restraining Order and Preliminary Injunction. (Motion for Preliminary Injunction and TRO, R. 20, Page ID # 243.) On December 8, 2025, the District Court held a full-day evidentiary hearing on Appellants' Motion. (*See* Transcript, R. 45, Page ID # 482.) During the hearing, the District Court took witness testimony and heard argument from counsel. (*Id.*) The next day, the District Court issued its Opinion and Order which denied Appellants' Motion (the "Opinion"). (Opinion and Order, R. 44, Page ID ## 459-81.)[4]

On December 11, 2025, Appellants filed their Notice of Appeal. (Notice of Appeal, R. 46, Page ID # 681.) Appellants later filed a "Motion to Expedite Appeal Pursuant to 6 Cir. R. 27(f)," (Motion to Expedite

---

[4] The District Court also denied the Ohio Agency Appellees' Motion to Dismiss on Abstention Grounds, (Opinion and Order, R. 44, Page ID ## 472, 481), though that ruling is not subject to this appeal.

Appeal, App. R. 2, Page # 1), which this Court granted as to briefing on December 17, 2025, (App. R. 16).

Appellants filed their Opening Brief on December 16, 2025, (Appellants' Br., App. R. 13), but received a Briefing Correction Letter (the "Letter") shortly thereafter because their "BRIEF IS MISSING THE DESIGNATION/ADDENDUM AND THE BOOKMARK ERRORS NEEDS TO BE REMOVED FROM BRIEF," (Briefing Correction Letter, App. R. 17). Appellants filed their "Corrected" Appellants' Brief[5] on December 17, 2025. (Appellants' Corrected Br., App. R. 18.)

## SUMMARY OF THE ARGUMENT

Contrary to what Appellants want this Court to believe, this is not a case about notice or due process. This case is about the specific injunctive relief Appellants asked the District Court to award, and whether the District Court erred in not granting that relief. In no uncertain terms, Appellants asked the District Court to enjoin

---

[5] Rather than correct only those defects noted in the Letter, Appellants improperly took this opportunity for "correction" to make numerous substantive changes to their Brief; add additional caselaw; change their issues presented (including attempting to lower the standard needed to obtain a preliminary injunction); and amend the relief they requested below, among other things.

enforcement of the amended portions of H.B. 96 that will effectuate a transfer of funds from the UFTF beginning January 1, 2026. Because Appellants sought injunctive relief as to their alleged takings claim **only**, this case begins—and ends—with the Supreme Court's decision in *Knick v. Twp. of Scott, Pennsylvania*, 588 U.S. 180 (2019), which makes clear that injunctive relief is not available here.

Consistent with *Knick*, the District Court denied Appellants' request to enjoin the enforcement of H.B. 96, as injunctive relief is not available for their takings claim. There is no error in the District Court's Opinion, which aligns with binding Supreme Court precedent. And even if injunctive relief were available here, the District Court did not err in finding Appellants failed to satisfy each of the four requirements to obtain a preliminary injunction.

Given the weight of the Supreme Court authority, and the District Court's reasoned analysis on how Appellants do not satisfy the preliminary injunction factors, it is perhaps no surprise that Appellants focus almost the entirety of their appeal on a request they never made below. In an attempt to avoid *Knick*, Appellants reimagine their request for injunctive relief, contending what they **really** asked for was an

injunction based on the alleged lack of "pre-deprivation notice" afforded to Appellants.

Yet, this was not the basis of Appellants' request for injunctive relief—not even close. Appellants sought to enjoin the transfer of the funds from the UFTF, based on the statutory provisions under H.B. 96 that will operate to effectuate that transfer, beginning January 1, 2026. That was the request below, and that was the statutory provision at issue below and here on appeal. The District Court properly reminded Appellants of this, noting that their request for preliminary injunctive relief does not relate to the notice provisions in Chapter 169 of the Ohio Revised Code, including, for instance, that there is no request for an injunction that "reforms the notice requirements." (Opinion and Order, R. 44, Page ID # 474 n.1.) The District Court was required to review Appellants' request—nothing more, and nothing less—which is exactly what it did. Because the District Court did not abuse its discretion in denying that request, its Opinion should be affirmed.

## ARGUMENT

### I. STANDARD OF REVIEW

The district court's denial of a request for a preliminary injunction is reviewed for abuse of discretion. *Int'l Union of Painters & Allied Trades District Council No. 6 v. Smith*, 148 F.4th 365, 370 (6th Cir. 2025). Reversal is only warranted if the district court "relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Id.* at 371 (citations and quotations omitted). The reviewing court may affirm the district court's denial of injunctive relief "for any reason supported by the record." *Id.* (citations and quotations omitted).

### II. THE DISTRICT COURT DID NOT ERR IN FINDING THAT INJUNCTIVE RELIEF IS NOT AVAILABLE TO APPELLANTS ON THEIR TAKINGS CLAIM.

Before the District Court, Appellants argued that starting January 1, 2026, their unclaimed funds, currently held in the UFTF, will be transferred if the amended escheat provisions under H.B. 96 are implemented and allowed to take effect. Appellants contend the forthcoming transfer of unclaimed funds will violate the Takings Clause of the Fifth Amendment, and therefore, they sought an injunction to

prevent this alleged transfer from occurring on January 1, 2026. (Complaint, R. 1, Page ID # 18, ¶¶ 94-98.)

## A. *Knick* and Its Progeny Foreclose Appellants' Request for Injunctive Relief.

As the District Court aptly recognized, there is a threshold problem with Appellants' request for injunctive relief. In *Knick*, the Supreme Court considered the availability of remedies to parties for an alleged taking. As the Court recognized, there was a time when parties were left without a clear or otherwise dependable monetary recourse if they suffered a governmental taking. *Knick*, 588 U.S. at 199-202. But, as the Court properly highlighted, this is far from the case today. *Id.* at 201. Instead, "the federal and nearly all state governments provide just compensation remedies to property owners who have suffered a taking." *Id.* Given the availability of this remedy, the Court made clear: "As long as an adequate provision for obtaining just compensation exists, there is **no basis** to enjoin the government's action effecting a taking." *Id.* (emphasis added).

Appellants give short shrift to *Knick*. Based on their read, *Knick* "merely indicates that equitable relief is not generally available **after** the taking has occurred," but "does not suggest injunctive relief is not

12

available to property owners who will suffer a taking **in the future**." (Appellants' Corr. Br., App. R. 18, Page # 22 (emphasis in original).) This is fundamentally incorrect, ignores additional language from *Knick*, and contradicts the Court's reasoned analysis.

The Court's exposition of takings remedies is not expressly, or even impliedly, limited to clarifying what remedies are available only after a taking is effectuated. The Court assured government actors that, "[a]s long as just compensation remedies are available—as they have been for nearly 150 years—injunctive relief will be foreclosed." *Knick*, 588 U.S. at 205. The understanding is: complete relief, through that very compensation, is attainable through a Fifth Amendment takings claim, should the plaintiff prevail. As the Court put it, it is because of the "availability of post-taking compensation" that "barring the government from acting will ordinarily not be appropriate." *Id.* at 202.

In addition to minimizing *Knick*'s import, Appellants wholly overlook the countless examples where *Knick* has been applied and enforced consistent with the Opinion. *Knellinger v. Young*, 134 F.4th 1034 (10th Cir. 2025), an unclaimed property case from earlier this year that Appellants actually cite in their Brief, is a prime example. There,

13

the Tenth Circuit Court of Appeals affirmed dismissal of the plaintiffs' equitable claims regarding their unclaimed property because, by virtue of alleging a takings claim, they (just like Appellants here) had an adequate remedy at law, as they could "obtain just compensation," making injunctive relief unavailable. *Id.* at 1038, 1043–45.

The Tenth Circuit is not alone in reinforcing this straightforward principle. In *Narrigan v. Goldberg*, 772 F. Supp. 3d 182 (D. Mass. 2025), another unclaimed property case, the district court reasoned that a constitutional challenge to Massachusetts's Disposition of Unclaimed Property Act was not eligible for injunctive relief. In light of *Knick*, the court explained, it simply cannot "halt an ongoing taking or prevent a future" taking when property owners can "obtain just compensation." *Id.* at 187, 193–94 (citing *Knick*, 588 U.S. at 185, 205).

The District Court here similarly understood that Appellants' takings claim simply does not qualify for injunctive relief—by its nature, and should Appellants succeed in proving their claim, they have an adequate remedy at law. This isn't because the Ohio Agency Appellees say so, nor is it because the District Court merely assumes so. It's because that's exactly what H.B. 96 ensures. Although, for the reasons explained

below, H.B. 96 does not result in a taking at all, even if it did, Appellants may submit claims for reimbursement for their unclaimed funds until **2036**—that is, ten years from January 2026. The District Court reminded Appellants of the availability of this very provision that ensures their receipt of just compensation, which they inexplicably continue to ignore.

## B. Appellants' Cited Authority Is Inapposite.

Instead of addressing **any** of the actual analysis in the District Court's Opinion, Appellants focus on two cases, *Barber v. Charter Twp. of Springfield, Michigan*, 31 F.4th 382 (6th Cir. 2022), and *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021), which they believe supply a reasoned basis for issuing an injunction to enjoin the transfer of unclaimed funds from the UFTF. Appellants contend *Barber* is a post-*Knick* opinion that "held that injunctive relief is available to prevent a future *per se* taking." (Appellants' Corr. Br., App. R. 18, Page # 22.) And as to *Cedar Point*, Appellants contend it involved the reversal of a denied preliminary injunction which was sought to enjoin enforcement of a state

statute, suggesting the same is warranted here. But neither case

applies.[6]

---

[6] Appellants also persist in relying upon a case that has been overruled: *Taylor v. Westly*, 488 F.3d 1197 (9th Cir. 2007) ("*Taylor II*"). In fact, Appellants used their "corrected" brief to expound upon their reliance on *Taylor II*, and affirmatively represented to the Court that in *Taylor II*, the Ninth Circuit "order[ed] injunction on unclaimed property law cases." (*Compare* Appellants' Corr. Br., App. R. 18, Page # 21, *with* Appellants' Br., App. R. 13, Page # 21, which only listed *Taylor II* as part of a string cite.)

At the Hearing, Appellants represented that *Taylor II* is their "best law" on the question of injunctive relief. (Transcript, R. 45, Page ID ## 655-56.) Not only does *Taylor II* pre-date *Knick*, but the Ninth Circuit has subsequently acknowledged that the Supreme Court's decision in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 19 (2008) (a case Appellants actually added to their "corrected" Brief), overruled the Ninth Circuit's approach to preliminary injunctions in *Taylor II. See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) ("In *Winter*, the Supreme Court definitively refuted our 'possibility of irreparable injury' standard, stating 'the Ninth Circuit's 'possibility' standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction.") (emphasis in original).

Ohio Agency Appellees have repeatedly made Appellants aware that they are relying on overruled caselaw, (Defendants' Opposition to Preliminary Injunction and TRO, R. 37, Page ID ## 365-66; Transcript, R. 45, Page ID # 668), yet **Appellants keep asking courts to rely on it without disclosing that it has been overruled on the issue for which they are presenting it**. This is now the third time Ohio Agency Appellees have had to point out that *Taylor II* has been overruled. This Court has previously explained that such behavior "would seem to violate" Ohio's professionalism rules, which require duty of candor to the tribunal, and merited a sanction of "[d]ouble costs of the appeal." *Kuhnle Bros, Inc. v. Cnty. of Geauga*, 103 F.3d 516, 520 n.2 (6th Cir. 1997).

*Barber* is about standing and ripeness—justiciability issues. Specifically, the sole question before the Court in *Barber* was whether the plaintiff alleged an injury sufficient to have standing to **bring** her claims, including claims for injunctive relief. *Barber*, 31 F.4th at 382. The Court reasoned that the plaintiff's claim of an alleged taking, which had not yet occurred, was ripe due to the understanding that the defendants had already decided to move forward with removal of a dam (the physical property at issue and the subject of the takings claim), and that the plaintiff had standing because of the substantial risk of harm shown and alleged as following from the forthcoming removal of the dam. *Id.* at 388-93.

Standing and ripeness concern the ability to bring a claim and to have it heard—this, as the Court admonished, should not be conflated with any arguments or issues on the merits of those claims. *Id.* at 390. Accordingly, *Barber* has nothing to do with whether injunctive relief is available for an alleged taking; it merely held that the plaintiff had standing to bring such a claim, which was ripe, and remanded the case for the court "to further consider whether Barber is entitled to injunctive

17

relief and whether she is entitled to proceed with her takings claim." *Id.* at 393.

As to *Cedar Point*, Appellants fail to develop their reliance on this case. While the Court reversed the denial of a preliminary injunction, the claim involved a *per se* physical taking—not at all at issue here—and the Court's analysis addressed only whether the district court erred in concluding that an access regulation did not constitute a *per se* physical taking, which the district court believed was subject to *Penn Central*'s multi-factor balancing test for review of the regulation. *Cedar Point*, 594 U.S. at 145-46. The Supreme Court disagreed, held it was a *per se* taking, and merely remanded for further proceedings. *Id.* at 152, 162.

Appellants imply that the Supreme Court's reversal of the district court's denial of the injunction in *Cedar Point* means that an injunction was appropriate there. That is baseless. In fact, the dissenting Justices, who decided to "touch briefly on remedies, which the majority **does not address**," brought *Knick* back into the picture, explaining that

> The Takings Clause prohibits the Government from taking private property for public use without just compensation. … But the employers do not seek compensation. They seek only injunctive and declaratory relief. Indeed, they did not allege any damages. … On remand, California should have the

choice of **foreclosing injunctive relief** by providing compensation.

*Id.* at 179 (Breyer, J., dissenting) (emphasis added).

*Knick*, and its applicable progeny, cannot be ignored. But that is exactly what Appellants ask this Court to do. As the District Court recognized, Appellants "ask this Court to enjoin an alleged taking, which the Court may not do under *Knick*." (Opinion and Order, R. 44, Page ID # 479.) This reason alone is dispositive and warrants affirmance of the Opinion.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING APPELLANTS' REQUEST FOR INJUNCTIVE RELIEF.

Even if *Knick* did not preclude the relief Appellants seek, this Court should still affirm the District Court's Opinion, because Appellants did not demonstrate they were entitled to the "extraordinary remedy" of injunctive relief. *Winter*, 555 U.S. at 24 (citation omitted). Courts consider four factors when determining if a party is entitled to injunctive relief: "(1) whether the movant has a **strong likelihood of success on the merits**; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest

19

would be served by issuance of the injunction."[7] *Ohio v. Becerra*, 87 F.4th 759, 768 (6th Cir. 2023) (citations and quotations omitted) (emphasis added). When the government is a party, as it is here, the third and fourth factors merge. *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020) (citations and quotations omitted).

### A. Appellants Do Not Have a Strong Likelihood of Success on the Merits.

Below, Appellants' Motion blended their claims under federal and state law. However, because the District Court lacked jurisdiction over Appellants' state law claims, (*see, e.g.,* Opinion and Order, R. 44, Page ID # 477), Appellants were left with their federal claims only, i.e., Counts I and II. In their Brief, however, when arguing they have "established a likelihood of success on the merits," (again, having omitted the requirement of demonstrating a "strong" or "substantial" likelihood of

---

[7] Appellants' "Corrected" Brief also attempts to reduce the standard for obtaining a preliminary injunction. (*Compare* Appellants' Br., App. R. 13, Page ## 21-22, acknowledging correctly they must demonstrate a "strong" or "substantial" likelihood of success on the merits, *with* Appellants' Corr. Br., App. R. 18, Page ## 21-22, deleting the words "strong" and "substantial" and contending they must only demonstrate a "likelihood" or "probability of success" on the merits.) The standard for obtaining a preliminary injunction is well-settled, and there is no authority supporting Appellants' misstatement of law.

success on the merits), Appellants focus solely on their "procedural due process claim," (Appellants' Corr. Br., App. R. 18, Page # 22), rather than their takings claim. In other words, they ignore the argument that formed the basis of their request for injunctive relief. (*See, e.g.*, Motion for Preliminary Injunction and TRO, R. 20, Page ID ## 243-44, 264.) The District Court appropriately focused its analysis on Appellants' Fifth Amendment takings' claim, and this Court should do the same.[8]

Because Appellants have failed to demonstrate that they have a strong likelihood of success on the merits of the only claim at issue on appeal, this Court should summarily affirm the Opinion. Even if the Court finds they have somehow **not** abandoned that claim for purposes of the preliminary injunction analysis, Appellants still cannot demonstrate a reasonable likelihood of success on the merits of their takings claim, which is fatal to their request for injunctive relief. *See Gonzales v. Nat'l Bd. of Medical Exam'rs*, 225 F.3d 620, 632 (6th Cir.

---

[8] Ohio Agency Appellees also refer the Court to Section IV of their Brief, which explains why the Court should similarly reject Appellants' attempts to focus on arguments regarding notice and due process. Appellants sought injunctive relief **only** as to their takings claim.

2000) (concluding that it need not consider the remaining injunction factors because the plaintiff had "no likelihood of success on the merits").

### 1. The Amended Statutes do not result in a taking.

#### (a) Challenged statutes are presumed constitutional.

Appellants' challenges to H.B. 96 fail as a matter of law. Appellants' Complaint, clothed in hyperbole and outrage, imagines H.B. 96 as a novel, unconstitutional way for the State to claim Ohioans' personal property. However, escheat statutes, like those amended by H.B. 96, have been around—and have withstood constitutional challenges—for decades. The amended statutes here are constitutional, and the State's assumption of title is not a taking.

Courts begin statutory analysis with a presumption that legislative enactments are constitutional, and the "party challenging the constitutionality of a statute bears the burden of proving that it is unconstitutional beyond a reasonable doubt." *Plain Loc. Sch. Dist. Bd. of Educ. v. DeWine*, 486 F. Supp. 3d 1173, 1196 (S.D. Ohio 2020) (quoting *State ex rel. Dix v. Celeste*, 11 Ohio St.3d 141, 142 (1984)). Further, "[a] facial challenge is 'the most difficult challenge to mount successfully,' because a plaintiff must carry a 'heavy burden' to 'establish that no set

of circumstances exists under which the Act would be valid.'" *Williams v. Cuyahoga Cnty.*, 776 F. Supp. 3d 653, 670 (N.D. Ohio 2025) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Thus, "[c]ourts construe statutes to avoid constitutional difficulty when 'fairly possible.'" *Eubanks v. Wilkinson*, 937 F.2d 1118, 1122 (6th Cir. 1991) (quoting *Crowell v. Benson*, 285 U.S. 22 (1932)).

### (b) H.B. 96 amends Chapter 169 to create "true escheat" statutes.

Escheat is a centuries-old concept. Originating in feudal England and incorporated into early American law, it provides that the sovereign takes title to real or personal property in the absence of any owner. Note, *Origins and Development of Modern Escheat*, 61 Colum. L. Rev. 1319, 1326-27 (1961). Originally applied as a principle of intestate succession, the concept expanded to include escheat of abandoned property. *See id.* at 1319-20, 1330. But rather than enacting "true" escheat statutes for personal property, many states elected to enact "custodial" escheat statutes through which the state did not necessarily take title. Under these custodial statutes, the state held the property for the benefit of the owners. *See id.* at 1330.

As states adopted unclaimed property statutes in the wake of the Revolutionary War, some states' "custodial" statutes provided for the state to take custody of the property indefinitely; others provided that, after a period of time, the property would escheat to the state. *See id.* at 1331 ("In some states the owner's claim is barred after the statutory period has expired, and at such time escheat occurs."); Bernert, *An Examination of Unclaimed Property Laws After the Adoption of RUUPA: Suggestions for Continued Advancement*, 71 Tax Law. 941, 944 (2018) ("Some states' laws provided for the state to conserve the property for the owner, while using it for the benefit of the state, until a statutory period passed and ownership passed to the state by escheat.").

### (c)    True escheat statutes are constitutional.

Escheat statutes have been the subject of constitutional challenges for decades, resulting in voluminous precedent confirming the constitutionality of the amended statutes here. Among the litany of authorities on this point, two United States Supreme Court cases are dispositive. First, in *Standard Oil Co. v. New Jersey*, 341 U.S. 428, 430 (1951), the plaintiff challenged New Jersey's Escheat Act. New Jersey's statute provided that, if property was unclaimed for 14 years, "such

24

personal property shall escheat to the State." *Standard Oil Co.*, 341 U.S. at 430. The plaintiff argued that the Act constituted an unconstitutional deprivation of its property. *Id.* at 431-32. The Court upheld the Act, explaining that "a state, subject to constitutional limitations, may use its legislative power to dispose of property within its reach, belonging to unknown persons." *Id.* at 436.

Thirty years later, the Supreme Court examined the constitutionality of an Indiana law that provided for the lapse of mineral rights after twenty years of nonuse. *Texaco, Inc. v. Short*, 454 U.S. 516, 518-19 (1982). That law extinguished the owners' mineral rights and vested them in the then-current property owner. *Id.* As here, the appellants argued that the law resulted in an unconstitutional taking. *Id.* at 522.

The Court disagreed, observing that "the State has the power to condition the permanent retention of [a] property right on the performance of reasonable conditions that indicate a present intention to retain the interest." *Id.* at 526. Examining its prior decisions, the Court concluded that, "[i]n each instance, as a result of the failure of the property owner to perform the statutory condition, an interest in fee was

deemed as a matter of law to be abandoned and to lapse." *Id.* at 529. That did not constitute a taking: "**this Court has never required the State to compensate the owner for the consequences of his own neglect**." *Id.* at 530 (emphasis added).

Since the Supreme Court's decisions in *Standard Oil Co.* and *Texaco*, courts continue to uphold statutes like the ones at issue here. *See, e.g.*, *Delaware v. New York*, 507 U.S. 490, 497 (1993) ("States as sovereigns may take custody of or assume title to abandoned personal property as *bona vacantia*, a process commonly … called escheat."); *Texas Mun. League Intergovernmental Risk Pool v. Texas Workers' Comp. Comm'n*, 74 S.W.3d 377, 382 (Tex. 2002) ("Under absolute-escheat statutes, the state acquires title to property through operation of law or a judicial proceeding" and recognizing that escheat statutes are constitutional if they give claimants notice after the state acquires the funds and an administrative and judicial hearing to adjudicate claims.").[9]

---

[9] *See also, e.g.*, *Christianson v. King Cnty.*, 239 U.S. 356 (1915) (holding that the legislature had authority to enact legislation codifying an escheat on death statute, and that an escheat under the law was proper); *Sec. Sav. Bank v. State of California*, 263 U.S. 282 (1923) (holding that abandoned funds properly escheated to the State of California after providing reasonable notice).

26

**(d)   The amended statutes are consistent with others that have long been upheld.**

The way the statutes have been amended precludes Appellants' takings claims. When individuals have abandoned their property, "the former owner retains no interest for which he may claim compensation." *Texaco*, 454 U.S. at 530. "It is the owner's failure to make any use of the property—and not the action of the State—that causes the lapse of the property right; there is no 'taking' that requires compensation." *Id.* at 517. Further, a State may place reasonable conditions on the ownership of property. *See id.* at 526 ("We have no doubt that, just as a State may create a property interest that is entitled to constitutional protection, the State has the power to condition the permanent retention of that property right on the performance of reasonable conditions that indicate a present intention to retain the interest."). Here, that "reasonable condition" is filing a claim in order to effectuate the return of unclaimed property. If the owner fails or refuses to do so, as Appellants have done here, the State is not required "to compensate the owner for the consequences of his own neglect." *Id.*

H.B. 96 falls squarely on the right side of *Standard Oil Co.* and *Texaco*. What Appellants claim amounts to an unconstitutional taking is

27

nothing of the sort; it is nothing more than a state's placement of reasonable conditions on the ownership of property, and the loss of ownership rights flows from "the owner's failure to make any use of the property—and not the action of the State." *Texaco*, 454 U.S. at 530.

### 2. Appellants are unlikely to prevail on their Due Process claims.

As noted above, Appellants base the entirety of the "likelihood of success on the merits" portion of their Brief on due process claims which were never part of their Motion, and thus, are not part of this appeal. More fundamentally, Appellants' due process complaints presume that the statutes in question operate to deprive them of their property which, as explained in Section III.A.1(a), (c), above, they do not. Even if they were entitled to notice, Appellants received constitutionally adequate notice, rendering their due process claims without merit.

Due process generally requires notice and an opportunity to be heard before a deprivation of property or liberty occurs. *See Jones v. Flowers*, 547 U.S. 220, 220 (2006); *Texaco*, 454 U.S. at 523. Notice is constitutionally adequate if it is "**reasonably calculated**, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v.*

*Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (emphasis added). Contrary to Appellants' argument, though, *Mullane*'s requirements to provide notice and an opportunity to be heard are not limitless. In fact, "[d]ue process does not require that a property owner receive actual notice before the government may take his property." *Jones*, 547 U.S. at 517.

In the context of escheat statutes, the Supreme Court has already opined on what constitutes adequate notice. In *Standard Oil Co.*, for example, the Court examined the notice provisions of New Jersey's unclaimed funds statute. That statute **required only notice by publication**, and the Court held that was sufficient notice. *Standard Oil Co.*, 341 U.S. at 443.

Finally, Appellants here had notice far exceeding any constitutional due process requirement. In addition to all the statutory notice requirements set forth in Revised Code Chapter 169, Appellants admit they each had **actual notice** of funds in the UFTF, as they allege that "[e]ach [Appellant] has confirmed, via a review of the website maintained by the Ohio Division of Unclaimed Funds, that the State is currently holding unclaimed property to which they are entitled[.]" (Complaint, R.

29

1, Page ID # 4, ¶ 13.) That admission makes it indisputable that Appellants had actual notice, and that notice exceeds what was constitutionally required of Ohio Agency Appellees. *See Keene Grp., Inc. v. City of Cincinnati, Ohio*, 998 F.3d 306, 312 (6th Cir. 2021) (recognizing that a party's "actual notice" defeats a due process argument about the adequacy of notice issued).[10] The fact of the matter is, Appellants have

---

[10] Using language that is particularly relevant here, this Court in *Keene Group* explained the fallacy of the plaintiff's argument as follows:

> Fundamentally, Plaintiff's due process argument is premised on a misunderstanding of the notice to which it was entitled in this case. Plaintiff alleges, which we accept as true, that it was not aware of the demolition order against the building on the property. However, that fact is irrelevant to the *Mullane* notice inquiry under the circumstances of this case. *Mullane* requires that a rights holder be apprised "of the pending proceedings," which Plaintiff admitted was the case even before it purchased the property. *Cruz-Gomez v. Lynch*, 801 F.3d 695, 700 (6th Cir. 2015). The fact that Plaintiff was unaware of the demolition order itself was the direct result of its own failure to take advantage of its "opportunity to present [its] objections," and not a deprivation of due process. *Mullane*, 339 U.S. at 314, 70 S.Ct. 652. Unlike the property owners in *Jones* or *Mennonite* [*Bd. of Missions v. Adams*, 462 U.S. 791 (1983)], Plaintiff had no doubt as to whether "proceedings are therefore likely to be initiated." *Mennonite*, 462 U.S. at 799, 103 S.Ct. 2706. Condemnation proceedings had begun, and Plaintiff knew it. Accordingly, the district court's dismissal of Plaintiff's due process claim was appropriate.

*Keene Grp., Inc.*, 998 F.3d at 313.

admitted that they had **actual knowledge** that they have funds in the UFTF. Whether or not they received any additional statutory notice, their due process rights have been satisfied as a matter of law and their due process claim, therefore, cannot succeed.

### B. Appellants Will Not Suffer Any Irreparable Harm When the Legislation Goes Into Effect on January 1, 2026.

The relative strength or weakness of the movant's likelihood of success on the merits "can often drive the results of a request for injunctive relief." *Smith*, 148 F.4th at 371. However, the "irreparable harm factor is indispensable because, without it, a plaintiff cannot show why he needs relief now rather than at the lawsuit's end." *Id.* (citations and quotations omitted). Accordingly, "the existence of an irreparable injury is mandatory," and only if shown, is the "extent of an injury" considered and balanced against other factors to determine a party's entitlement to injunctive relief. *Id.* (citations and quotations omitted).

For many of the reasons set forth in Section II, *supra*, Appellants cannot establish they will suffer irreparable harm absent injunctive relief. The District Court did not abuse its discretion when it concluded Appellants had an adequate remedy at law where Appellants' alleged injury could be compensated by monetary damages.

31

Under the injunctive relief standard, "the existence of an irreparable injury is mandatory." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). It is well established that preliminary injunctive relief "is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Where injuries have "an adequate remedy at law," such as sufficient monetary relief, those injuries are not "irreparable." *Id.*

In the takings context, in particular, the Supreme Court has long recognized that "[e]ven where the remedy at law is less clear and adequate, where large public interests are concerned, and the issuance of an injunction may seriously embarrass the accomplishment of important governmental ends, a court of equity acts with caution, and only upon a clear showing that its intervention is necessary in order to prevent irreparable injury." *Hurley v. Kincaid*, 285 U.S. 95, 104 n.3 (1932) (finding that no such showing was made even if the plaintiff could demonstrate illegality because such a complaint is "confined to the failure

to compensate him for the taking, and affords no basis for an injunction if such compensation may be procured in an action at law").

Thus, this Court has recognized that to establish that they will face irreparable harm in the absence of injunctive relief, Appellants must show that they are at risk of suffering some harm that "is not fully compensable by monetary damages." *Smith*, 148 F.4th at 371 (quotation omitted). And *Knick* was clear: "As long as an adequate provision for obtaining just compensation exists, **there is no basis to enjoin the government's action effecting a taking**." 588 U.S. at 201 (emphasis added).

Appellants do not attempt to address *Knick* in this section of their Brief—"corrected" or otherwise. Instead, they claim—without citation to authority—that deprivation of property without due process, by itself, is an irreparable injury. (Appellants' Corr. Br., App. R. 18, Page # 33.) They also cite several non-binding cases for the premise that the denial of a constitutional right, itself, constituted irreparable harm. (*Id.*) But those cases are patently inapposite.

- *Ross v. Meese,* 818 F.2d 1132, 1135 (4th Cir. 1987), is a Fourth Amendment search-and-seizure case, and the quotation Appellants

reference addresses the district court's "equitable jurisdiction," not the preliminary injunction factors themselves. This case also predates *Knick* by over 30 years.

- *Taylor v. Westly*, 402 F.3d 924 (9th Cir. 2005), deals with escheat of stocks, not funds already transferred, and significantly predates *Knick*.

- *Suever v. Connell*, 439 F.3d 1142 (9th Cir. 2006), similarly deals with personal property, rather than monetary damages, and again, significantly predates *Knick*.

Appellants' reliance on this Court's decision in *Obama for America v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012), invites even more scrutiny. While the Court noted that "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed," *Husted*, 697 F.3d at 437, Appellants omit the sentence **immediately prior to that**, which states "[a] plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages," *id.* (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007)).

The authorities Appellants rely upon are markedly distinguishable, and Appellants make no attempt to address, or otherwise contend with, these distinctions. Compounding the shortcomings in their Brief, Appellants also fail to make any demonstrable showing regarding the absence of any adequate remedy at law, should they prevail on the merits of their claims. Recall, Appellants argued below that once the unclaimed funds are transferred out of the UFTF, the funds will be liquidated and, once spent on construction, no funds will be available to compensate them. (Motion for Preliminary Injunction and TRO, R. 20, Page ID # 275.) The plain language of Ohio's Unclaimed Funds Law instructs quite otherwise—as it contemplates an entire procedure for exactly this scenario—and there is **nothing** in the Record to substantiate Appellants' hypothetical claims of insolvency.

Starting with the legislation's plain language. Ohio Rev. Code § 169.08(I)(b) instructs that even when property rights are deemed abandoned and the unclaimed funds escheat to the State on January 1, 2026:

> [T]he former owner or other person claiming a property interest in unclaimed funds that are deemed abandoned and escheat to the state may file a claim for payment of an equivalent amount, together with interest earned by the state

35

if required under division (D) of this section, **at any time on or before January 1, 2036**. Upon providing sufficient proof of the validity of the owner's or other person's claim, the director shall pay the claim less any expenses and costs incurred by the state in securing full title and ownership of the unclaimed funds.

Ohio Rev. Code § 169.08(I)(b). There are two critical takeaways from that language. First, until January 1, **2036**, a former owner of an interest in unclaimed funds may recover those funds, plus interest if applicable. *Id.* Second, so long as the former owner provides sufficient proof of entitlement to the funds, the payout is **mandatory**—the director "shall" pay the claim. *Id.*

Moreover, as the District Court correctly found, Appellants' concerns that the UFTF will not have sufficient funds to pay claims (a concern for which there is no evidence whatsoever in the Record), itself is cured by the already-existing statute, which will remain in effect even after January 1, 2026:

> As discussed at the December 8, 2025 hearing, to the extent Plaintiffs argue that Ohio's administrative process for recovering unclaimed funds is inadequate because the funds in the UFTF may become insufficient to pay out valid claims once permanent escheatment begins on January 1, 2026, they did not provide evidence to this effect. (ECF No. 43.) Instead, Ohio Revised Code § 169.08 establishes that the Director of Commerce "shall" pay valid claims for unclaimed funds **and creates a process to ensure the UFTF has a sufficient**

36

**balance to pay pending claims**. (*Id*.); Ohio Rev. Code §§ 169.08 (A), (I), (E).

(Opinion and Order, R. 44, Page ID # 479 n.3 (emphasis added).)

The District Court properly rejected Appellants' unsubstantiated concerns. Between $1.7 – 1.9 billion will escheat on January 1, 2026. (*Id*., Page ID # 462.) The Record confirms that more than $2 billion will remain in the UFTF after that point, (*see, e.g.*, Transcript, R. 45, Page ID # 649), and the statute provides a mechanism for the Director of Commerce to pay any claims that exceed the balance that will remain in the UFTF post-escheat. Appellants conveniently gloss over these basic facts. Given this unrefuted evidence, the District Court did not abuse its discretion when determining Appellants failed to show any inadequacy with the statutorily prescribed administrative claims process or the availability of just compensation in the event Appellants demonstrate entitlement to recovery of unclaimed funds.[11] This Court should affirm.

---

[11] After the District Court issued its Opinion, Appellants' counsel, Marc Dann, admitted in a published interview that "even if [Appellants did not get a preliminary injunction in place between now and January 1, 2026], **that money can always,** … **[t]he state can reimburse the unclaimed funds account**." *See* Karen Kasler, The Statehouse News Bureau, "Federal judge rules Ohio can transfer unclaimed funds to be used for Browns' stadium," Dec. 10, 2025, available at

## C.   The "Substantial Harm to Others" and "Public Interest" Factors Do Not Support Injunctive Relief.

When considering the third and fourth injunction factors, the District Court noted that the parties both made several arguments, which "arguably cut both ways." (Opinion and Order, R. 44, Page ID # 481.) The District Court did not come down in either side's favor, but noted that even if it assumed both factors in Appellants' favor, it would not "overcome [Appellants'] failure to establish irreparable harm, which forecloses preliminary injunctive relief because even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement." (*Id.* (cleaned up).)

The District Court is certainly correct that Appellants' failure to establish irreparable harm precludes relief, so the Court can and should affirm on that basis. The Court can also affirm because Appellants did not carry their burden on the third and fourth factors, either.

---

https://www.statenews.org/government-politics/2025-12-10/federal-judge-rules-ohio-can-transfer-unclaimed-funds-to-be-used-for-browns-stadium (last visited Dec. 22, 2025) (emphasis added). Appellees respectfully request that the Court take judicial notice of Mr. Dann's statements, pursuant to Fed. R. Evid. 201(b).

### 1. The issuance of an injunction would, indeed, cause substantial harm to others.

The issuance of an injunction requires the Court to consider whether an injunction would cause substantial harm to others. *Ammex, Inc. v. Wenk*, 936 F.3d 355, 359 (6th Cir. 2019). A governmental body can be substantially harmed by an injunction. For example, the government can be substantially harmed by an injunction preventing the enforcement of a constitutional law. *See, e.g.*, *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (affirming denial of injunction and explaining that "the government presumably would be substantially harmed if enforcement of a *constitutional* law aimed at fighting child pornography were enjoined") (emphasis in original). Here, the requested injunction stands to inflict an injury on the State of Ohio; specifically, an injury "to [its] interest in enforcing [its] duly enacted laws without contradiction from the federal government." *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 594-95 (6th Cir. 2024).

Appellants claim—without **any** evidentiary support—their alleged injuries "cannot be undone by money damages, post-hoc administrative claims, or later judicial review." (Appellants' Corr. Br., App. R. 18, Page # 25.) That is just wrong. The only "property" at issue is money already

held in the UFTF. There will be no transfer of physical property. If the money in the UFTF is somehow taken by the State without just compensation (and again, it is Ohio Agency Appellees' position that no taking occurs, as the funds have been **abandoned**), that injury can be compensated with money damages. Stated differently, money can replace money, and the District Court correctly determined Ohio Rev. Code Chapter 169 provides Appellants (and any others) with the mechanism to do so. (Opinion and Order, R. 44, Page ID # 475.)

### 2.    The issuance of an injunction is not in the public interest.

In what is presented as barely an afterthought, Appellants claim that the issuance of an injunction would serve the public interest because "[t]here is no public interest in the enforcement of unconstitutional laws, and there is a profound public interest in ensuring that the State complies with the Due Process and Takings Clauses of the United States Constitution." (Appellants' Corr. Br., App. R. 18, Page # 35.) That, of course, presumes the unconstitutionality of the statutes in question without recognizing that when individuals abandon their property, they no longer have property in which to claim an interest; it is "deemed as a

matter of law to be abandoned and to lapse," *Texaco, Inc.*, 454 U.S. at 529.

In contrast, it is actually the escheat of the unclaimed (abandoned) funds that is in the public interest. Rather than waste taxpayer dollars managing and holding funds for owners who will never show up, the State has deemed it appropriate to have that money escheat specifically to serve the public. Placing their private judgment ahead of that of Ohio's duly elected officials, Appellants argue that the use of the escheated funds to help with the construction of a new stadium is a "private" endeavor with no benefit to the public.[12] (Appellants' Corr. Br., App. R.

---

[12] Appellants have repeatedly suggested that a portion of the escheated funds will go to a private entity, the Cleveland Browns, and they have insinuated (though not directly argued) that such an outcome would constitute a taking for a private—instead of public—purpose. (*See* Appellants' Corr. Br., App. R. 18, Page # 35.) Appellants are incorrect, as the legislation itself is specific about how the funds are to be used: "to support construction of a transformational major sports facility mixed-use project pursuant to section 123.281 of the Revised Code that is associated with a Brook Park economic development project." H.B. 96, Section 229.40.

Regardless of how outraged Appellants are that a professional sports team will play at that facility, that does not make the legislation a taking for private purposes. As the District Court correctly explained:

> Plaintiffs attempt to distinguish *Knick*, 588 U.S. 180 (2019), by arguing that the case "presupposes the existence of a

18, Page # 35.) In reality, though, the escheated funds will put otherwise dormant funds to use to serve Ohio taxpayers.

The appropriation made in H.B. 96 is intended to raise revenue, and there are strict limitations on that appropriation. For example, H.B. 96 requires that any major sports facility generate tax revenues **in**

---

lawful taking," and, here, the "purpose of the state's taking" is "[c]onstitutionally deficient since the taking is not for a public purpose and 'private use takings are unconstitutional regardless of whether just compensation is paid.'" (ECF No. 41, Page ID 427 (quoting *Montgomery v. Carter County*, 226 F.3d 758, 767 (6th Cir. 2000)). **This argument is flawed because statutes that promote economic development serve a public purpose by "provid[ing] appreciable benefits to the community, including—but by no means limited to— new jobs and increased tax revenue**." *Kelo v. City of New London, Connecticut*, 545 U.S. 469, 483–90 (2005). As discussed at the December 8, 2025 hearing, the Ohio legislature has made a finding that the funds challenged by Plaintiffs are part of a plan to promote economic development. See Am. Sub. H.B. No. 96 § 229.40, 136th G.A. (Ohio 2025); (ECF No. 43). Plaintiffs contend that House Bill 96 permits the government to take funds for a purely private purpose, namely, "a private football stadium project fund," but the legislation makes clear that these funds "support construction of a transformational major sports facility mixed-use project pursuant to section 123.281 of the Revised Code that is associated with a Brook Park *economic development project*." *Id*. (emphasis added); (ECF No. 41, Page ID 425).

(Opinion and Order, R. 44, Page ID # 476 n.2 (bold and italics emphasis added).)

**excess of** the appropriation within 16 years. H.B. 96 at Section 221; Ohio Rev. Code § 123.281(H)(5). To reach that goal, the organization seeking to construct the facility must sign an agreement specifying target returns in four-year increments. H.B. 96 at Section 221; Ohio Rev. Code § 123.281(H)(5)(a)(i). If the project fails to create a return for Ohio's taxpayers, the State is to be reimbursed from an escrow account created as a prerequisite to an appropriation of money. H.B. 96 at Section 221; Ohio Rev. Code § 123.281(H)(5)(c).

Thus, "[t]he professional sports franchise planning to use the facility, or the owner or an authorized affiliate, [must have] executed … an escrow amount equal to eight and one-third per cent of the total amount of the performance grant appropriated for the project[.]" H.B. 96 at Section 220; Ohio Rev. Code § 123.281(H)(4)(a). Applied to the $600 million appropriation that has drawn Appellants' ire, that will require an escrow amount of approximately about $50 million, which will be available for the State's reimbursement in the event that a major sports facility project fails to generate tax revenues in excess of the State's appropriation. In other words, the appropriation ultimately is for the public's benefit—a benefit that an injunction would thwart.

43

For any of these reasons, the District Court did not abuse its discretion when finding Appellants could not meet their burden to demonstrate a preliminary injunction was warranted. This Court should affirm.

## IV. THE DISTRICT COURT DID NOT ERR IN RECOGNIZING APPELLANTS DID NOT REQUEST INJUNCTIVE RELIEF BASED ON AN ALLEGED PRE-DEPRIVATION NOTICE VIOLATION UNDER THE DUE PROCESS CLAUSE.

Because the District Court properly rejected Appellants' request for injunctive relief—both in light of *Knick*, and given their failure to satisfy the four preliminary injunction requirements—Appellants dedicate nearly the entirety of their appeal to **amending** their request for injunctive relief.

As Appellants frame it now, the "district court also erred in refusing to consider Appellants' procedural due process claim as a separate basis for injunctive relief." (Appellants' Corr. Br, App. R. 18, Page # 23.) Not only did the District Court not err in this way, (*see* Opinion and Order, R. 44, Page ID ## 474 n.1, 479-80), but it frankly **could not have** made this error.

Appellants' own Motion defines their request for injunctive relief as follows:

44

> Plaintiffs Mary Bleick, Todd Butler, Allen Skierski and Gary Petrime, individually and on behalf of all others similarly situated (collectively "Plaintiffs"), hereby move this Court for an Entry for a Preliminary Injunction pursuant to Civ. R. 65(a)(1) related to Defendants, Sheryl Maxfield, in her official capacity as the Director of Commerce, Akil Hardy, in his official capacity as the Superintendent of the Division of Unclaimed Funds, Robert Sprague, in his official capacity as Treasurer of the State of Ohio, and Joy Bledsoe, in her official capacity as Executive Director of the Ohio Facilities Construction Commission (collectively "Defendants"), prohibiting any action to transfer any of the funds held in the Ohio Unclaimed Funds Trust Fund scheduled to begin as of January 1, 2026.

(Motion for Preliminary Injunction and TRO, R. 20, Page ID # 243 (highlighting added).) Similarly, Appellants' proposed order on their request for injunctive relief provides as follows:

> For good cause shown the Court hereby **GRANTS** Plaintiff's Motion. Defendants are hereby enjoined from transferring prohibit the transfer of all funds held in the Ohio Unclaimed Funds Trust Fund to private entities as contemplated by the passage of H.B. 96 which is scheduled to begin as of January 1, 2026. This order shall remain in effect under further order of this Court.

(Proposed Order, R. 20-1, Page ID # 282 (highlighting added).)

The District Court made these very observations in its Opinion, reminding Appellants that they did "not move for relief related to their due process claims," and only asked "the Court to prevent Defendant from taking their unclaimed funds on January 1, 2026." (Opinion and Order, R. 44, Page ID # 474 n.1.) The District Court also recognized that an injunction related to enforcement of a statute must, of course, be based

on the actual language of the statute, or section, in question. On this point, the District Court again reminded Appellants that their "request for preliminary injunctive relief does not relate to the **notice provisions** in Chapter 169 of the Ohio Revised Code." (*Id.*, Page ID ## 479-90 (emphasis added).)

Appellants' last-ditch attempt to play fast and loose with their own filings should be rejected. And while it goes without saying, a request for injunctive relief is not, as Appellants may hope, subject to ongoing revision or amendment. Appellants made a request, and the District Court directly addressed that request. As the District Court helpfully explained, Appellants "do not move for relief related to their due process claim, such as a preliminary injunction that reforms the notice requirements set forth in Chapter 169 of the Ohio Revised Code. Instead, Plaintiffs ask the Court to prevent Defendants from taking their unclaimed funds on January 1, 2026." (*Id.*, Page ID # 474, n.1.)

Accordingly, the District Cout did not commit any error in calling Appellants' misplaced emphasis on due process and notice principles what it is; namely, an attempt "to circumvent the Supreme Court's reasoning in *Knick* and obtain an injunction when they have an adequate

remedy at law to recover those unclaimed funds." (*Id.*, Page ID ## 479-80.) Appellants' pre-deprivation notice and due process arguments are therefore entirely irrelevant, and should be rejected outright, as they do not supply any basis for reviewing the propriety of the Opinion.

## **CONCLUSION**

The district court's denial of Appellants' Motion for Preliminary Injunction and Temporary Restraining Order should be *affirmed*.

Respectfully submitted,

/s/ *Aneca E. Lasley*
Aneca E. Lasley
  *Lead Counsel*
ICE MILLER LLP
250 West Street, Suite 700
Columbus, Ohio 43215
(614) 462-1085
Aneca.Lasley@icemiller.com

Joshua A. Klarfeld
ICE MILLER LLP
600 Superior Avenue East, Suite 1600
Cleveland, OH 44114
(216) 394-5063
Joshua.Klarfeld@icemiller.com

*Counsel for Appellees*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,946 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Century Schoolbook font.

Date: December 22, 2025

/s/ *Aneca E. Lasley*
Aneca E. Lasley

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2025, I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Aneca E. Lasley*
Aneca E. Lasley

# ADDENDUM

## Appellees' Designation of
## Relevant District Court Documents

In accordance with Sixth Circuit Rule 28(a), Appellees designate

the following relevant documents in the electronic record:

| Docket Entry | Description of Document | Page ID # |
|---|---|---|
| 1 | Complaint | 1-26 |
| 20 | Motion for Preliminary Injunction and TRO | 243-244, 264, 275 |
| 20-1 | Proposed Order | 282 |
| 37 | Defendants' Opposition to Preliminary Injunction and TRO | 365-366 |
| 42 | Stipulation of Facts | 452-455 |
| 44 | Opinion and Order | 459-481 |
| 45 | Transcript | 482-678 |
| 46 | Notice of Appeal | 681 |

51